ALPHONSO JOHNSON *v.* COMMISSIONER OF CORRECTION
(13946)
RODNEY HENDERSON *v.* COMMISSIONER OF CORRECTION
(13947)
ALAN CANADY *v.* COMMISSIONER OF CORRECTION
(13948)
KEITH FREEMAN *v.* COMMISSIONER OF CORRECTION
(13949)
DENNIS JACKSON *v.* COMMISSIONER OF CORRECTION
(13950)
LINDSAY JOHNSON *v.* COMMISSIONER OF CORRECTION
(13951)
CHRISTOPHER LEECAN *v.* COMMISSIONER OF CORRECTION
(13952)
JOHN MANLEY, JR. *v.* COMMISSIONER OF CORRECTION
(13953)
WILLIAM MASON *v.* COMMISSIONER OF CORRECTION
(13954)
SHERMAN MILES *v.* COMMISSIONER OF CORRECTION
(13955)
DARYL RUTH *v.* COMMISSIONER OF CORRECTION
(13956)

DAVIS TYSON *v.* COMMISSIONER OF CORRECTION
(13957)

EDDY WOOLCOCK *v.* COMMISSIONER OF CORRECTION
(13958)

RICHARD AUSTIN *v.* COMMISSIONER OF CORRECTION
(13959)

NAPIER TALTON *v.* COMMISSIONER OF CORRECTION
(13960)

JONATHAN WATLEY *v.* COMMISSIONER OF CORRECTION
(13972)

JAMES BRANTLEY *v.* COMMISSIONER OF CORRECTION
(13973)

WILBERT HINTON *v.* COMMISSIONER OF CORRECTION
(13974)

LUTHER FLEMING *v.* COMMISSIONER OF CORRECTION
(13975)

ARMANDO VALERIANO *v.* COMMISSIONER OF CORRECTION
(13976)

JOSE CASUL *v.* COMMISSIONER OF CORRECTION
(13977)

BRUCE ROGERS *v.* COMMISSIONER OF CORRECTION
(13978)

LEAMOND SUGGS *v.* COMMISSIONER OF CORRECTION
(13979)

NATHANIEL CARTER *v.* COMMISSIONER OF CORRECTION
(13980)

WILLIAM PARKER *v.* COMMISSIONER OF CORRECTION
(13981)

REGINALD JONES *v.* COMMISSIONER OF CORRECTION
(13982)

ANTONIO FELICIANO *v.* COMMISSIONER OF CORRECTION
(13984)

WILLIAM DUPREE *v.* COMMISSIONER OF CORRECTION
(13985)

ROGER HARRELL *v.* COMMISSIONER OF CORRECTION
(13986)

CECILIO DELEON *v.* COMMISSIONER OF CORRECTION
(13987)

FLOYD SIMMS *v.* COMMISSIONER OF CORRECTION
(13988)

SHEA, COVELLO, HULL, BORDEN and SANTANIELLO, Js.

Argued December 7, 1990—decision released April 23, 1991

*Elizabeth M. Inkster,* assistant public defender, with whom was *G. Douglas Nash,* public defender, for the appellants (petitioners in Docket Nos. 13946 through 13960).

*Charlotte G. Koskoff,* with whom was *Stephen Frazzini,* for the appellants (petitioners in Docket Nos. 13972 through 13988).

*James A. Killen,* assistant state's attorney, with whom, on the brief, was *John J. Kelley,* chief state's attorney, for the appellee (respondent).

SHEA, J. In each of these thirty-one habeas corpus actions, the petitioner claims that his conviction is constitutionally flawed because the pool of veniremen available for selection of a petit jury for his trial and, in some instances, for selection of the grand jury that indicted him,[1] was tainted by a disproportionate paucity of members of his minority group in violation of his right to equal protection of the laws, as guaranteed by the fourteenth amendment to our federal constitution.[2] All the petitioners rely upon the decision of the United States Court of Appeals for the Second Circuit in *Alston* v. *Manson,* 791 F.2d 255 (2d Cir. 1986), holding that the town quota system for selecting veniremen established

---

[1] In Docket No. 13949, *Keith Freeman* v. *Commissioner of Correction,* the petitioner never went to trial but pleaded guilty to the grand jury indictment charging him with felony murder. He claims that he never would have pleaded guilty if he had known of the availability of a challenge to the grand jury. The habeas court rejected this claim after hearing the evidence. Our disposition of these cases makes it unnecessary to review this alternative ground for the judgment dismissing his petition. In Docket No. 13984, *Antonio Feliciano* v. *Commissioner of Correction,* the petitioner also pleaded guilty to the grand jury indictment. The habeas court concluded that his plea constituted a waiver of any defect in the composition of the grand jury. Again, because of our disposition of these cases on different grounds, we need not address this alternative basis for the habeas court's decision.

[2] The fourteenth amendment to the United States constitution, § 1 provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

by General Statutes (Rev. to 1975) § 51-220 had resulted in underrepresentation of black people in the pool of prospective jurors and grand jurors serving New Haven County in 1975, when the trial of the petitioners in that case took place, and that this disparity violated the principle of equal protection.[3] A similar claim presented to this court on appeal as a violation of the right to a jury composed of a fair cross section of the community under the sixth amendment to our federal constitution, together with many other jury composition claims, had been rejected in *State* v. *Haskins,* 188 Conn. 432, 436–41, 469, 450 A.2d 828 (1982).

Unlike the situation in *Alston,* however, none of these petitioners presented any effective challenge to the array of grand or petit jurors before trial, as required by Practice Book § 811,[4] and, accordingly, they would ordinarily be deemed to have waived the infirmities now relied upon to set aside their convictions, as Practice Book § 810[5] provides. The habeas court ruled, neverthe-

---

[3] In *Alston* v. *Manson,* 791 F.2d 255 (2d Cir. 1986), the court affirmed the judgment of the federal District Court based on the same ground in *Alston* v. *Lopes,* 621 F. Sup. 992 (D. Conn. 1985), which was announced on November 5, 1985. Throughout this opinion the designation *Alston* refers to the decision of the Second Circuit unless otherwise indicated.

[4] "[Practice Book] Sec. 811. ——TIME FOR MAKING PRETRIAL MOTIONS OR REQUESTS

"Unless otherwise provided by these rules or statute, all pretrial motions or requests shall be made not later than ten days after the first pretrial conference in the court where the case will be tried, or, with permission of the court, at such later time as the judicial authority may fix. However, defenses and objections alleging lack of jurisdiction over the offense charged or failure of the indictment or information to charge an offense may be raised by the defendant or noticed by the judicial authority at any time during the pendency of the proceedings."

[5] "[Practice Book] Sec. 810. ——FAILURE TO RAISE DEFENSE, OBJECTION OR REQUEST

"Failure by a party, at or within the time provided by these rules, to raise defenses or objections or to make requests that must be made prior to trial

less, that there had been no such waiver because the evidence did not indicate that the petitioners had deliberately bypassed their right to challenge the array of prospective jurors or grand jurors. The court also rejected an alternative claim of the petitioners that the failure of their attorneys to raise and pursue challenges to the array constituted ineffective assistance of counsel in violation of the sixth amendment to our federal constitution.[6] Proceeding to the merits of the claim of disproportionate representation in the jury pools, the court concluded that the petitioners had not established any underrepresentation of black or Hispanic people for the years involved, 1976 through 1983, because no evidence as to the actual composition of those pools based upon observation or records of their membership had been presented. Accordingly, judgments were rendered dismissing each petition.

On appeal, the petitioners contest the conclusion of the habeas court that they have failed to prove any underrepresentation of the minority groups to which they belonged in the jury arrays available for the selection of jurors and grand jurors at the time of their convictions. They also maintain that the judgments should be reversed because of the refusal of the court to grant their petitions on the alternative ground of ineffective

shall constitute a waiver thereof, but a judicial authority, for good cause shown, may grant relief from such waiver, provided, however, that lack of jurisdiction over the offense charged or failure of the indictment or information to charge an offense may be raised by the defendant or noticed by the judicial authority at any time during the pendency of the proceedings.''

[6] The sixth amendment to the United States constitution provides: ''In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defense.''

assistance of counsel based upon the failure of their attorneys to present timely challenges to the array. The state claims, as an alternative ground for affirming the judgments, that the applicable standard for reviewability of these belated challenges to the array is the "cause and prejudice" standard of *Wainwright* v. *Sykes,* 433 U.S. 72, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977), and not "deliberate bypass," as proclaimed in *Fay* v. *Noia,* 372 U.S. 391, 83 S. Ct. 822, 9 L. Ed. 2d 837 (1963).

We conclude, contrary to the habeas court's view, that the appropriate standard for reviewability in a habeas corpus proceeding of constitutional claims not adequately preserved at trial because of a procedural default, such as failure to challenge the array, is the *Wainwright* standard of "cause and prejudice," as the state contends. We also decide that the petitioners have not satisfied that standard. We affirm the conclusion of the habeas court, however, that the petitioners have not demonstrated ineffective assistance of counsel, although on grounds different from those relied on by the court. Because we conclude that habeas review is precluded by the failure to file challenges to the array before trial, as required by § 811, we do not address the merits of the equal protection claims of the petitioners.

The pertinent facts are not disputed. All the petitioners are black or Hispanic and were convicted during the period that § 51-220[7] remained in effect. This

---

[7] "[General Statutes (Rev. to 1975)] Sec. 51-220. NUMBER OF JURORS FOR EACH TOWN. The number of jurors to be chosen for each town shall be as follows: In towns whose population as determined by the last-completed census of the United States is less than seven hundred and fifty, fifteen; in towns whose population so determined is at least seven hundred and fifty but not more than one thousand five hundred thirty; in towns whose population so determined is more than one thousand five hundred but not more than twenty-five hundred, fifty-six; in towns whose population so deter-

statute, which originated in colonial times, specified the number of jurors to be chosen yearly from each town of this state according to a classification based on the population of the town. The number of jurors from a town, however, was not uniformly proportional to its population but was skewed to provide for larger proportions of jurors from smaller towns. During the period when the petitioners were convicted, the statute, at its extremes, provided for thirty jurors in towns with populations of 750 through 1500, or 2 percent of their populations, while towns with populations of more than 100,000 were allowed 1012 jurors, or 1 percent of their populations. No provision was made for additional jurors from towns with populations substantially

mined is more than twenty-five hundred but not more than five thousand, ninety; in towns whose population so determined is more than five thousand but not more than ten thousand, one hundred twenty; in towns whose population so determined is more than ten thousand but not more than twenty-five thousand, two hundred twenty-five; in towns whose population so determined is more than twenty-five thousand but not more than fifty thousand, three hundred thirty-seven; in towns whose population so determined is more than fifty thousand but not more than one hundred thousand, six hundred seventy-five; and in towns whose population so determined is more than one hundred thousand, one thousand and twelve; provided, for the purposes of this section, the population of a town shall not include the patients of any state institution located in such town."

This statute was amended in 1982 by Public Acts 1982, No. 82-307, § 2 (February 1982 Session), to repeal the town quota system for choosing prospective jurors and to provide that the number of jurors "from each town shall be equal to one and one-half percent of the town's population," but these changes were made applicable only to jurors summoned for duty on or after September 1, 1983. By a further amendment, adopted in June, 1983, but not effective until July 1, 1985, the jury administrator was empowered to determine the appropriate percentage to be used in determining the number of jurors from each town for duty on and after September 1, 1986. Public Acts 1983, No. 83-5, § 4 (June 1983 Session). Before the 1983 amendment became effective, a further amendment, effective June 7, 1984, reinstated the statutorily fixed one and one-half percent of each town's population for determining the number of jurors from each town with respect to jurors summoned on or before August 31, 1986, but authorized the jury administrator to establish the appropriate percentage to be used for those summoned on or after September 1, 1986. Public Acts 1984, No. 84-393, § 4.

greater than 100,000, such as New Haven, where most of the black and Hispanic people in the county reside.

Only four of the petitioners[8] filed challenges to the array and these were never pursued. In the habeas court the petitioners attempted to estimate retrospectively the impact of § 51-220 on the proportion of black and Hispanic people in the jury arrays for the years 1976 through 1983 by applying statistical theory to census data. According to the statistical method used,[9] the statute resulted in shortfalls projected on the basis of population varying from 3 percent to 7 percent of the number of black or Hispanic jurors for all the petitioners, except two of the three Hispanic petitioners, whose shortfalls were 18 percent and 16 percent. In *Alston* v. *Manson,* supra, 258, the court concluded on the basis of a shortfall of 1.58 percent for black jurors in New Haven county not only that § 51-220 had a disparate impact but also that a "presumption of discriminatory intent" arose from its existence, which the state had failed to rebut.

I

In *Fay* v. *Noia,* supra, 438–39, the United States Supreme Court held that federal habeas corpus jurisdiction was not affected by the procedural default, specifically a failure to appeal, of a petitioner during state court proceedings resulting in his conviction. The court recognized, however, a limited discretion in the federal habeas judge to "deny relief to an applicant who has deliberately by-passed the orderly procedure of the state courts and in so doing has forfeited his state court remedies." Id., 438. This deliberate bypass standard for waiver required " 'an intentional relinquishment or

---

[8] Such challenges were filed by petitioners Kenneth Freeman (Docket No. 13949), Armando Valeriano (Docket No. 13976), Napier Talton (Docket No. 13960), and Reginald Jones (Docket No. 13982), but were either withdrawn or not pursued.

[9] The method used is referred to as the statistical decision theory or SDT.

abandonment of a known right or privilege' " by the petitioner personally and depended on his "considered choice." Id., 439. "A choice made by counsel not participated in by the petitioner does not automatically bar relief." Id. Under this standard, the habeas court's conclusion in these cases, that there had been no deliberate bypass of the right to challenge the jury array because the petitioners were unaware of their right to do so, is unassailable. The state does not contend otherwise.

The deliberate bypass standard of *Fay* was implicitly abandoned in two subsequent cases involving post-conviction challenges to grand juries that, like the petitions before us, were based on the exclusion of minorities. In those cases the court enforced explicit waiver provisions of state and federal procedural rules similar to § 810 and § 811 by declining to consider the merits of the constitutional claims raised. *Francis* v. *Henderson,* 425 U.S. 536, 96 S. Ct. 1708, 48 L. Ed. 2d 149 (1976); *Davis* v. *United States,* 411 U.S. 233, 93 S. Ct. 1577, 36 L. Ed. 2d 216 (1973). In *Wainwright* v. *Sykes,* supra, 87, the court expressly rejected the "sweeping language" of *Fay,* "which would make federal habeas review generally available to state convicts absent a knowing and deliberate waiver of the federal constitutional contention." The court upheld a state court's refusal to decide the merits of a claimed *Miranda*[10] violation first raised in a posttrial motion and in state habeas corpus proceedings, contrary to a state "contemporaneous objection" rule. The court adopted as a new standard for federal habeas review the rule set forth in *Francis* v. *Henderson,* supra, 542, that "[i]n a collateral attack upon a conviction," the petitioner must make "not only a showing of 'cause'

---

[10] See *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

for the defendant's failure to challenge the composition of the grand jury before trial, but also a showing of actual prejudice." Thus was born the *Wainwright* "cause and prejudice" standard for habeas review.

The petitioners claim, nevertheless, that this court, despite the demise in *Wainwright* of the deliberate bypass standard for maintaining a federal habeas corpus petition, has adhered to that standard in state habeas proceedings. We first adopted the deliberate bypass standard for state habeas proceedings in 1966, three years after *Fay* had been decided. *Vena* v. *Warden,* 154 Conn. 363, 366–67, 225 A.2d 802 (1966). "We hold . . . that a petitioner may collaterally raise federal constitutional claims in a habeas corpus proceeding even though he has failed to appeal his federal constitutional claims directly to us if he alleges and proves by a fair preponderance of the evidence, facts which will establish that he did not deliberately bypass the orderly procedure of a direct appeal." Id. In our first reference to the *Wainwright* revision of the federal standard, we distinguished between strategic or tactical decisions of the kind normally committed to counsel and those left to the defendant himself, such as "whether to plead guilty, to forego the assistance of counsel or to refrain from an appeal." *McClain* v. *Manson,* 183 Conn. 418, 428–29 n.15, 439 A.2d 430 (1981). For the latter category, specifically with respect to the failure to appeal, we indicated that the deliberate bypass standard of *Fay* would be applicable.[11] Id. We have continued to apply the deliberate bypass stan-

---

[11] "Thus, despite the subsequent limitations on *Fay,* and because *Sykes* left open the question whether its 'cause' and 'prejudice' standard would apply in a *Fay* type case where the failure to take an appeal was involved, the ultimate responsibility that is upon the defendant himself to decide whether an appeal is to be taken persuades us to apply the 'deliberate bypass' standard of *Fay* to this case." *McClain* v. *Manson,* 183 Conn. 418, 429 n.15, 439 A.2d 430 (1981).

dard to habeas petitioners seeking the determination of issues that should properly have been raised on appeal. *Valeriano* v. *Bronson,* 209 Conn. 75, 85, 546 A.2d 1380 (1988); *Payne* v. *Robinson,* 207 Conn. 565, 568–69, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988); *Paulsen* v. *Manson,* 193 Conn. 333, 337–38, 476 A.2d 1057 (1984); *D'Amico* v. *Manson,* 193 Conn. 144, 146–47, 476 A.2d 543 (1984); *Morin* v. *Manson,* 192 Conn. 576, 579, 472 A.2d 1278 (1984); *Turcio* v. *Manson,* 186 Conn. 1, 3, 439 A.2d 437 (1982).

Since the advent of *Wainwright,*[12] we have not in a habeas proceeding applied the deliberate bypass standard to a procedural default in the trial court, such as a failure to challenge a jury array before trial, except in one instance. In *Payne* v. *Robinson,* supra, 569, we indicated that the exception for unpreserved constitutional claims articulated in *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973), so frequently invoked on direct appeal, should apply also "to constitutional claims raised for the first time in a collateral proceeding so long as they are not barred by the petitioner's deliberate bypass of a direct appeal." We referred specifically to "claims that were not properly preserved at trial when they facially implicate fundamental constitutional rights and *are adequately supported by the record.*"[13] (Emphasis added.) *Payne* v. *Robinson,* supra. In *State*

---

[12] Prior to *Wainwright,* we had allowed a habeas petitioner to present constitutional claims never raised in the trial court as well as those not raised on appeal if he alleged and proved that he had not deliberately bypassed opportunities to present such claims in accordance with standard procedural rules. *Walters* v. *Warden,* 155 Conn. 316, 319, 232 A.2d 112 (1967); *Vena* v. *Warden,* 154 Conn. 363, 366, 225 A.2d 802 (1966).

[13] It is not clear whether in *Payne* v. *Robinson,* 207 Conn. 565, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988), the record referred to, which provided the evidentiary basis for the review conducted by the habeas court, was the transcript of the trial or of the habeas corpus proceeding.

v. *Evans,* supra, 70–71, which was a direct appeal from the judgment of conviction in the trial court, we rejected for lack of an adequate record a claim similar to those of these petitioners, "that the jury were selected in a constitutionally impermissible manner in that members of the black race were systematically excluded from the jury . . . ." That claim had first been raised on appeal and we declared that, "[s]ince the record discloses nothing whatsoever to support this claim, we have no basis for determining its merits and do not consider it." Id, 71. Thus, even if we were to follow *Payne* in these cases with respect to the applicability of the *Evans* standard to constitutional claims not preserved at trial because of a procedural default, these petitioners could not prevail since the trial court record in each case contains nothing regarding the composition of the petit or grand juries that they belatedly challenge.

We have concluded, however, that our dictum in *Payne*[14] concerning the applicability of the *Evans* standard of appellate review to constitutional claims first raised in postconviction habeas corpus proceedings was inappropriate. We failed to give sufficient consideration to the special problems that are likely to arise relating to the feasibility of a second trial when a conviction is set aside by a habeas court rather than by an appellate court. These problems are related mainly to the more extended delay of the second trial that frequently

[14] In *Payne* v. *Robinson,* 207 Conn. 565, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988), we reviewed in a habeas appeal a claim that evidence obtained from an unlawful search had been admitted at a probation revocation hearing, despite the absence of a motion to suppress or any objection to such evidence. We held, however, that the exclusionary rule was inapplicable to such a proceeding and upheld the judgment. The portion of the opinion concerning reviewability, therefore, was not essential to the outcome of the appeal and may be characterized as dictum.

results from a reversal of a conviction by a habeas court. There is no statute of limitation or other time limit that would bar a habeas petition. *United States* v. *Smith*, 331 U.S. 469, 475, 67 S. Ct. 1330, 91 L. Ed. 1610 (1947). Ordinarily the petition may not be filed until appellate remedies have been exhausted, lest the petitioner be charged with a deliberate bypass of an appeal. An additional record must be created in the habeas court, which may require extensive testimony. If the petitioner is successful in overturning his conviction, another appeal is almost inevitable.

A direct appeal following a conviction, on the other hand, is subject to strict time limits at each stage of the proceeding. Except for extraordinary cases, an appeal in this state is ordinarily determined within approximately one year from the date it was filed. The greater time lapse that results when a second trial is ordered by a habeas court has a serious impact on the availability of witnesses and other evidence for the second trial. Memories fade with the passage of time, exhibits are lost, and other evidence is less likely to be available. Appellate counsel would have less incentive to raise on appeal all arguable constitutional claims of the defendant if another opportunity to raise such claims were available in the habeas court. We are convinced that these consequences would be sufficiently harmful to the administration of justice in this state as to require that we withdraw our dictum in *Payne* concerning the applicability of the *Evans* standard for appellate review to habeas corpus proceedings.

Apart from *Payne*, the petitioners' claim of continued adherence by this court to the deliberate bypass standard for habeas corpus review following its abandonment by the federal courts is unfounded with respect to trial court procedural defaults. We have expressly reserved the issue of whether to adopt the federal cause

and prejudice standard for procedural defaults in the trial court, because it has not become necessary previously to resolve that issue. *Valeriano* v. *Bronson,* supra, 83 n.7; *McClain* v. *Manson,* supra, 429 n.15. With respect to such defaults on appeal, as previously noted, we have not applied the federal standard. *Valeriano* v. *Bronson,* supra, 86; *Paulsen* v. *Manson,* supra, 337–38; *D'Amico* v. *Manson,* supra, 148; *Morin* v. *Manson,* supra, 579; *Turcio* v. *Manson,* supra, 3. These petitions, however, afford an appropriate occasion for declaring our adoption of the federal standard for habeas review with respect to constitutional claims not properly preserved because of a trial court default. If deliberate bypass were the sole barrier to such review, it could seldom be invoked for a default at trial. It is not common practice and would be unduly cumbersome to establish a record in the trial court showing that the defendant had personally made a knowledgeable waiver of his constitutional procedural rights on each of the myriad occasions that arise during a criminal trial when such rights are involved. Most of these choices during trial, such as whether to move for suppression of evidence or to cross-examine a particular witness, must necessarily be left to counsel, subject to the requirement that his performance satisfy reasonable standards of competency. In those rare instances in which a deliberate bypass is found, of course, habeas review would be barred for that reason alone, apart from the cause and prejudice standard. *Fay* v. *Noia,* supra, 438–39.

We are persuaded that habeas review of constitutional claims never raised in the trial court, in violation of our rules of practice, would thrust too great a burden on our criminal justice system. Commenting specifically upon the necessity for enforcement of a rule requiring that challenges to the composition of grand juries be made before trial, the United States Supreme

Court has declared: "If its time limits are followed, inquiry into an alleged defect may be concluded and, if necessary, cured before the court, the witnesses, and the parties have gone to the burden and expense of a trial. If defendants were allowed to flout its time limitations, on the other hand, there would be little incentive to comply with its terms when a successful attack might simply result in a new indictment prior to trial. Strong tactical considerations would militate in favor of delaying the raising of the claim in hopes of an acquittal, with the thought that if those hopes did not materialize, the claim could be used to upset an otherwise valid conviction at a time when reprosecution might well be difficult." *Davis* v. *United States,* supra, 241; see *Vena* v. *Warden,* supra, 367. These considerations are especially significant for the thirty-one petitioners now before us, whose trials took place between seven and sixteen years ago. Furthermore, if the jury composition claims had been raised at trial, it would have been possible to ascertain by observation, with greater certainty than by statistical analysis based on only one of many factors affecting jury composition, whether there was any actual disparity of minority representation among the jurors available for selection in each case.

We need not in this case consider whether some revision in our adherence to the deliberate bypass standard for procedural defaults in the appellate process is warranted. The federal courts have refused to except procedural defaults at the appellate level from the application of the *Wainwright* cause and prejudice standard. *Murray* v. *Carrier,* 477 U.S. 478, 489–90, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). Some of the evil consequences we have mentioned with respect to trial court defaults that delay the resolution of issues that should have been decided expeditiously by appeal also arise when defendants inexcusably defer the filing or

processing of an appeal and utilize habeas corpus in order to circumvent the appellate procedural bar. This question, however, is not presently before us and we leave it for another time.

We conclude, therefore, that the habeas court, after finding that the petitioners had not deliberately bypassed their right to review of their jury composition claims, should have then applied the *Wainwright* cause and prejudice standard for reviewability of constitutional claims that were not raised seasonably, as required by a trial court procedural rule. Unless the petitioners can satisfy that standard, they are not entitled to review of their claims on the merits.

## II

We must now consider whether the petitioners have satisfied the federal habeas standard for reviewability when there has been a procedural default, "cause and prejudice." The habeas court concluded that the petitioners had demonstrated cause but not prejudice. We disagree with the first conclusion and, therefore, find it unnecessary to discuss the second, because, for reviewability, a federal petitioner must establish cause and prejudice conjunctively. *Murray* v. *Carrier,* supra, 496–97. "[A]ny prisoner bringing a constitutional claim to the federal court house after a state procedural default must demonstrate cause and actual prejudice before obtaining relief." *Engle* v. *Isaac,* 456 U.S. 107, 129, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982).

The source of the requirement that good cause be shown to excuse a procedural default was the provision of Rule 12 (b) (2)[15] of the federal rules of criminal

---

[15] [Federal Rules of Criminal Procedure (U.S.C., 1970 Ed.)] Rule 12. PLEADINGS AND MOTIONS BEFORE TRIAL; DEFENSES AND OBJECTIONS . . . .

"(b) The Motion Raising Defenses and Objections. . . .

"(2) Defenses and Objections Which Must Be Raised. Defenses and objections based on defects in the institution of the prosecution or in the indict-

procedure that failure to raise defenses or objections required to be made before trial " 'constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver.' " *Davis* v. *United States,* supra, 236. Implicitly "cause" denotes good cause. See *United States* v. *Harrelson,* 705 F.2d 733, 738 (5th Cir. 1983); *United States* v. *Johnson,* 614 F.2d 622, 623 (8th Cir. 1980); see also *Davis* v. *United States,* supra, 256 (Marshall, J., dissenting).

In finding such cause in these cases, the trial court concluded that, because it was the "settled law" in Connecticut that challenges to the constitutionality of § 51-220 would have been futile prior to the federal court decision in *Alston,* the legal basis for making such a constitutional claim was not reasonably available to the attorneys representing the petitioners at the time of their trials, all of which preceded that decision. The court relied upon a statement in *Reed* v. *Ross,* 468 U.S. 1, 14, 104 S. Ct. 2901, 82 L. Ed. 2d 1 (1984), that "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the requirement [of cause] is met." "Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar." Id., 15.

We disagree with the habeas court's conclusion that a challenge to the array based upon underrepresenta-

ment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. The motion shall include all such defenses and objections then available to the defendant. *Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver.* Lack of jurisdiction or the failure of the indictment or information to charge an offense shall be noticed by the court at any time during the pendency of the proceeding."

(This rule was amended April 22, 1974, effective December 1, 1975; July 31, 1975, Pub. L. No. 94-64, § 3 [11], [12], 89 Stat. 372.)

tion of black or Hispanic people stemming from the impact of § 51-220 was sufficiently novel at the time of the petitioners' trials to excuse their failure to raise such a claim before trial. It is true that in *State* v. *Townsend,* 167 Conn. 539, 548–50, 356 A.2d 125, cert. denied, 423 U.S. 846, 96 S. Ct. 84, 46 L. Ed. 2d 67 (1975), this court had rejected a claim that § 51-220 operated to exclude a disproportionate number of black people from the jury pools because of their residence in Norwalk, Stamford, and Bridgeport, three urban towns of Fairfield County. The basis for denying this claim, however, was the failure to present evidence of "what percentage of the black residents in these towns are registered voters and whether they are more concentrated in one town than another," because "[j]uror selection is not based on residence, but on voter registration." Id., 549 We concluded that "it is impossible to decide this claim on the data presented." Id., 549–50. *Townsend* can hardly be viewed as upholding the constitutionality of § 51-220 in the context of evidence sufficiently demonstrating that its town quota system of juror selection had resulted in underrepresentation of black people qualified as registered voters to become jurors. Thus, it was not the "settled law in Connecticut" that challenges to the array of jurors based upon the influence of § 51-220, if properly presented, would be futile.[16]

Furthermore, even if the trial court's assumption were correct concerning the inevitable outcome of motions to challenge the array in this state at the time the petitioners were tried, the futility of presenting such a challenge in a state court is not a sufficient

---

[16] It must be remembered that the attorneys who represented the petitioners in *Alston* did file a challenge to the array in 1975 in the trial court based in part on a claim that the town quota system for jury selection discriminated against black people.

excuse for failure to do so at trial. *Engle* v. *Isaac,* supra, 130. "If a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim. Even a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid. Allowing criminal defendants to deprive the state courts of this opportunity would contradict the principles supporting *Sykes.*" Id. "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray* v. *Carrier,* supra, 486–87.

From the viewpoint of federal constitutional law at the time of the petitioners' trials, it can hardly be contended that there was no reasonable basis for challenging a jury array upon the ground that a statute, such as § 51-220, might have a disproportionate impact on the availability of minority jurors. Such a claim had been made prior to 1975 in *State* v. *Townsend,* supra, before any of these petitioners had been tried and was not categorically rejected. Challenges to jury composition have been the subject of litigation in the federal courts for more than a century. See *Neal* v. *Delaware,* 103 U.S. 370, 394, 26 L. Ed. 567 (1880); *Virginia* v. *Rives,* 100 U.S. 313, 321, 25 L. Ed. 667 (1879); *Strauder* v. *West Virginia,* 100 U.S. 303, 309, 25 L. Ed. 664 (1879). The statistical decision theory as applied to jury composition, which was relied on in *Alston* to establish the improbability that mere chance might account for the disparities claimed, had been circulating at least since 1966 and had been recognized as an appropriate analytical device in a decision of the United States Supreme Court argued in 1976. See M. Finkelstein, "The Application of Statistical Decision Theory to the Jury Discrimination Cases," 80 Harv. L. Rev. 338

(1966); see also *Castaneda* v. *Partida,* 430 U.S. 482, 97 S. Ct. 1272, 51 L. Ed. 2d 498 (1977).

This case does not present a circumstance heretofore recognized as a ground for excusing a procedural default, such as when the United States Supreme Court "has articulated a constitutional principle that had not been previously recognized but which is held to have retroactive application." *Reed* v. *Ross,* supra, 17. *Alston* did not purport to expound any new constitutional principles but merely upheld the findings of the federal district court that (1) the defendants had established a prima facie case of discrimination against black jurors on the basis of an estimate of the probable impact of § 51-220 on the jury pool for New Haven County in 1975 calculated by use of the statistical decision theory; and (2) the state had failed to refute the inference of discrimination raised by the statistical evidence. The legal principles relied upon had been set forth in *Castaneda* v. *Partida,* supra, and the only novelty in the *Alston* decision was the success of the defendants in persuading the federal district and circuit courts to conclude that a presumption of intentional discrimination on the part of the legislature was warranted because of the disparate impact of § 51-220 on black residents of New Haven County.

We conclude, therefore, that the habeas court was incorrect in finding that there was no reasonable basis for raising a challenge to the array grounded upon § 51-220 at the time of the petitioners' trials, all of which followed the trial of the defendants in *Alston.* Accordingly, the petitioners have failed to demonstrate that there was good cause for their failure to challenge the jury arrays before trial.

### III

The remaining ground upon which the petitioners seek to have their convictions set aside is that the fail-

ure of their attorneys to make and pursue challenges to the arrays available for selection of the grand or petit jurors who considered their cases constituted ineffective assistance of counsel in violation of their right to competent legal representation created by the sixth amendment to our federal constitution.[17]

"[T]he right to counsel is the right to the effective assistance of counsel." *McMann* v. *Richardson,* 397 U.S. 759, 771 n.14, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970). There are two components of a claim of ineffective assistance of counsel. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The trial court held that these petitioners had not satisfied either component. It concluded that the failure of their counsel to challenge the composition of the arrays was reasonable in view of the "settled law" in this state regarding the constitutionality of § 51-220. The court also concluded that the petitioners had not shown prejudice because (1) there was no evidence that the outcome of their cases would have been different if the jurors who had indicted or convicted them had included more members of their minority groups, and (2) its finding that the evidence did not establish the claimed equal protection violation necessarily implied that there had been no prejudice.

We have expressed in Part II our disagreement with the habeas court's view of the "settled law" concerning the viability of a constitutional challenge to § 51-220 based upon its impact on minority representation in jury arrays. Accordingly, we reject the ground relied on by the court for concluding that counsel perform-

---

[17] See footnote 6, supra.

ance had not been deficient. We conclude, nevertheless, that the attorneys representing the petitioners did not fall below the *Strickland* standard by failing to challenge the arrays. Thus we affirm the court's ultimate conclusion that the petitioners had not demonstrated ineffective assistance of counsel. It is unnecessary, therefore, for us to address the question of prejudice, which the court decided adversely to the petitioners.

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland* v. *Washington,* supra, 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id., 688. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." (Citations omitted.) Id., 689. "We have long recognized . . . that the Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle* v. *Isaac,* supra, 134.

The petitioners rely largely on the hindsight provided by the decision in *Alston* as setting the professional norms for counsel performance in their cases, which were disposed of prior to that decision. In that case, which was tried in New Haven in 1975, the defendants,

who were black, made an all-encompassing challenge to the petit jury array based upon the exclusionary effect of the jury selection system on such persons as teachers, students, clergymen, women, and people of low income and poor education, but also including black people. The principal thrust of the claim of discrimination against blacks was the disparate impact on them of the statutory requirement existing in 1975[18] that jurors be electors, because of their failure at that time to register as voters in the same proportion as the general population. Among the various claims raised in the briefs when the defendants appealed to this court, however, was some reference to the discriminatory effect on blacks of the statutory town quota system of juror selection. Conn. Supreme Ct. Records & Briefs, Vol. A-807, June Term, 1982, Part 3, Haskins Reply Brief, p. 7, and Alston brief, p. 20; see *State* v. *Haskins,* supra, 439–40. This challenge to the array was viewed by this court as presenting a claim that their right under the sixth and fourteenth amendments to our federal constitution had been violated because the array did not represent a fair cross section of the community rather than as an equal protection of the laws claim. *State* v. *Haskins,* supra, 436–41, 469; see also *Alston* v. *Lopes,* supra, 994 n.1. The statistical evidence that was relied upon in *Alston* to prove that § 51-220 had caused underrepresentation of black people in the jury array was never presented at trial or to this court, but was first brought forth in the federal district court. *Alston* v. *Lopes,* supra, 992.

---

[18] General Statutes (Rev. to 1975) § 51-217 required that "[a]ll jurors shall be electors" until October 1, 1982, when an amendment providing as an alternative, that jurors may be "citizens of the United States who are residents of this state and listed in the records of the motor vehicle department as persons to whom motor vehicle operators' licenses have been issued" became effective. Public Acts 1982, No. 82-11, § 1. This prior amendment did not become applicable to any of the arrays of jurors available at the time the petitioners were convicted.

The petitioners' claims of ineffective assistance of counsel are based solely upon the failure of their attorneys to perceive what the *Alston* attorneys, at least in 1985 before the federal district court, did perceive, that a viable equal protection challenge might be based upon the disparate impact of § 51-220 on minority representation on juries. We do not agree that such a failure constitutes a violation of the *Strickland* standard for competent representation of a criminal defendant. Even with the hindsight provided by *Alston,* it is debatable whether a challenge to the array, even if successful, must inevitably redound to the benefit of a criminal defendant. Unlike an acquittal, which is dispositive of the charge, a successful challenge to the array simply delays a final resolution of the case in the trial court while a different jury array is assembled and, when a defendant has not been released on bond, often may result in prolonged incarceration of defendants ultimately found not guilty. Furthermore, upon observation of the members of a grand jury or of a particular panel of jurors in the courtroom available for selection in the trial of a case, counsel may well be satisfied that it contains as many minority jurors as needed to satisfy equal protection or fair cross section standards, and possibly more than required. In *Alston,* it was found on the basis of the statistical evidence presented that the array should have been 5.96 percent black to correspond with the proportion of black residents of New Haven county, but was actually only 4.38 percent black, a shortfall of 1.58 percent. It is far from clear that the professional norm would demand in every case that counsel should expend the resources necessary to pursue a challenge to the array simply because there might then be 1.58 more blacks among every one hundred jurors available for jury selection. The actual, as opposed to estimated, minority composition of the grand juries or of the panels of jurors available for selection

of the juries in the cases of the petitioners is not revealed by the record. It would be speculative to assume that they were so plainly underrepresentative of minorities that competent counsel would have viewed the situation as warranting a challenge to the array in order to ensure fairness to his minority client.

As precedent to support their claim that failure to raise and pursue a challenge to the array that might ultimately prove successful warrants a finding of ineffective assistance of counsel, the petitioners rely on *Goodwin* v. *Balkcom,* 684 F.2d 794, 820 (11th Cir. 1982), cert. denied, 460 U.S. 1098, 103 S. Ct. 1798, 76 L. Ed. 2d 364 (1983). In that case the court in finding ineffective assistance did rely partly on the failure of counsel to challenge the array as underrepresentative of black people and of women. Some time after the petitioner had been convicted, and sentenced to death, the jury selection system in the same Georgia county was successfully challenged on those grounds. The court, however, was primarily concerned with counsel's general attitude as indicated by his testimony in explaining his failure to challenge the array, that he was concerned over community ostracism if he should make such a challenge and had already suffered embarrassment from inquiries received about his representation of the defendant. Id., 805–807. The court also relied upon the failure of counsel to move to suppress a confession that may have been the product of an illegal arrest. Id., 819. A failure to challenge a grand jury array alone, even when subsequent events relating to the same grand jury lists demonstrate that such a challenge would have been effective, has been rejected as a basis for finding ineffective assistance of counsel, despite the court's evident awareness of *Goodwin* as a controlling precedent. *Fleming* v. *Zant,* 560 F. Sup. 525, 537–38 (M.D. Ga. 1983). Having concluded that

the petitioners have not demonstrated ineffective assistance of counsel in accordance with the first requirement of the *Strickland* standard, we affirm the habeas court's rejection of this claim without consideration of the second requirement, prejudice.

The judgments are affirmed.

In this opinion the other justices concurred.